**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
------------------------------------------------------------------------×
CONNOR DINNERMAN,

                *Plaintiff,*                             **21-cv-11053**

     *v.*

                                              <u>**COMPLAINT**</u>
PEP BOYS: MANNY, MOE, AND JACK OF DELAWARE
INC.,

                                            **Jury Trial Requested**

               *Defendant.*
------------------------------------------------------------------------×

Plaintiff Connor Dinnerman ("Plaintiff" or "Dinnerman"), by his counsel, The Liddle Law Firm PLLC, alleges for his Complaint against Defendant Pep Boys: Manny, Moe, and Jack of Delaware Inc. ("Defendant" or "Pep Boys") as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     Plaintiff brings this action against Defendant for discriminating against him based on his religious beliefs and practices by failing to provide him with a reasonable accommodation, retaliating against him for requesting a reasonable accommodation, subjecting him to a hostile work environment, and constructively terminating his employment, all in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12 *et seq*.

2.     Plaintiff also brings this action against Defendant for breach of contract and the implied covenant of good faith and fair dealings.

<u>**JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES**</u>

3.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under Title VII.

4.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's NJLAD and common law claims, as these claims are so related to the claims within such original jurisdiction that they form part of the same case or controversy.

5.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over Plaintiff's claims, as the matter in controversy exceeds $75,000 and is between citizens of different states:

a.   Plaintiff is a citizen of the State of New Jersey, as he is domiciled in the State of New Jersey.

b.   Upon information and belief, Defendant is a citizen of the State of Delaware, as it is a corporation organized under the laws of the State of Delaware, and a citizen of the State of Pennsylvania, as its headquarters is located in the State of Pennsylvania.

6.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the District of New Jersey, as a substantial part of the events giving rise to these claims occurred within this District.

7.     All conditions precedent to maintaining this action have been fulfilled.  A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a Right-to-Sue letter dated February 23, 2021, relating to the discriminatory acts described in this Complaint.  This action was properly initiated within 90 days of the issuance of the Right-to-Sue letter.

## **PARTIES**

8.     Plaintiff, at all times relevant hereto, was and is a resident of Hudson County in the State of New Jersey.  Plaintiff was hired by Defendant as a Customer Service Agent before being promoted to Assistant Manager.

9.      Upon information and belief, at all times relevant hereto, Defendant was and is a corporation organized under the laws of the State of Delaware with its headquarters located at 3111 W. Allegheny Ave., Philadelphia, Pennsylvania 19132.

10.     Defendant is a national automotive aftermarket service chain with dozens of locations in the State of New Jersey.

## STATEMENT OF FACTS

11.     In July 2018, Pep Boys hired Dinnerman as a Customer Service Associate at its Hackensack location.

12.     During the application, hiring, and onboarding processes, Dinnerman told Store Manager, Marc Caramucci, that, due to his Orthodox Jewish faith, he was not able to work on Saturdays, the Shabbat.

13.     Every Saturday, Dinnerman observes the Shabbat and then attends religious events at his synagogue.

14.     Dinnerman requested that he not be scheduled to work on Saturdays due to his sincerely held religious beliefs and practices.

15.     Pep Boys granted that request.

16.     Dinnerman had an exemplary sales record and, in February 2019, Pep Boys promoted him to Assistant Manager of its Pine Brook location.

17.     From February 2019 to early November 2019, Dinnerman's supervisors (Caramucci; Philip Ramos, Pine Brook Store Manager; and Raymond Negron, Area Director) accommodated his religious beliefs by not requiring him to work on Saturdays.

18.     At no point—whether as a Customer Service Associate or Assistant Manager—did that accommodation cause Pep Boys any undue hardship, nor would it have.

19.     On the morning of November 18, 2019, Ramos scheduled Dinnerman to be off of work on the following two Saturdays, as usual, and submitted that schedule to Senior Area Director, Vincent Lemmo, for approval.

20.     Later that morning, Ramos informed Dinnerman that Lemmo overrode the submitted schedule and was going to require Dinnerman to work on Saturday, November 30, 2019.

21.     Ramos further informed Dinnerman that Lemmo would be requiring Dinnerman to work every Saturdays from then on.

22.     Dinnerman complained to Ramos that Lemmo refused to provide him with a religious accommodation.

23.     Ramos agreed with Dinnerman that Lemmo was refusing to provide him a religious accommodation and contacted Dinnerman's supervisor, Negron.

24.     That afternoon, Negron called Dinnerman to discuss his work schedule.

25.     Dinnerman explained that, since the beginning of his employment with Pep Boys, he had never worked on Saturdays due to his religious beliefs and practices.

26.     Negron responded that Dinnerman would not be required to work on Saturday, November 30, 2019; however, Negron qualified his conduct by saying, "We can work with this as long as [Ramos] has the help he needs."

27.     Later that afternoon, Dinnerman received a call from Lemmo and Negron.

28.     Lemmo stated that Pep Boys was no longer willing to accommodate Dinnerman's religious practices.

29.     Lemmo told Dinnerman that if Dinnerman did not start working on Saturdays, Pep Boys would demote him to a Customer Service Associate position with a 50 percent pay cut and, if Dinnerman refused to take the demotion and pay cut, Pep Boys would terminate his employment.

4

30.     That evening, Dinnerman sent Jami Cradle, Regional Human Resources Representative, an email in which he complaints about religious discrimination.

31.     The following morning, November 19, 2019, Cradle called Dinnerman.

32.     During the call, Dinnerman described both phone calls with Negron and Lemmo to Cradle, who told Dinnerman that Dinnerman should have filled out a form to make a formal request for religious accommodation to avoid being scheduled to work on Saturdays.

33.     Dinnerman explained that he had never received such a form and further explained that his supervisors were all aware of his religious observance of the Saturday Shabbat.

34.     Nonetheless, Dinnerman filled out the religious accommodation form and sent it to Cradle via email.

35.     Cradle called Dinnerman later that afternoon with Lemmo.

36.     Dinnerman again complained that the change to a Saturday work shift was not in line with his religious beliefs and practices, or the established religious accommodation that he had been receiving since the start of his employment, which had proven not to be an undue hardship on Pep Boys.  Cradle stated that the company could no longer accommodate his religious observance, without providing any reason as to why or what had changed.

37.     Lemmo and Cradle suggested that they "might be able to compromise" if Dinnerman "compromised" by accepting a transfer to Pep Boys' Hasbrook Heights location and agreeing to work on "some" Saturdays "whenever the company need[ed]" him.

38.     This "compromise" was totally unacceptable, as it did not accommodate Dinnerman's religious beliefs and practices.

39.     Dinnerman explained that this threatened transfer and continued insistence on Saturday scheduling did not accommodate his religious beliefs and practices.

40.     Lemmo and Cradle told Dinnerman that he needed to accept the proposed transfer and occasional Saturday work requirement or the demotion with a 50 percent pay cut, or Pep Boys would terminate his employment.

41.     On November 27, 2019, Dinnerman detailed the discrimination described above to Pep Boys through counsel.

42.     On December 16, 2019, Cradle told Dinnerman Saturday work was required for any higher position at Pep Boys that Dinnerman wished to obtain.

43.     On December 20, 2019, Pep Boys and Dinnerman executed a contract (the "Contract") with the following terms: (1) Dinnerman would be transferred from the Pinebrook location to the Hasbrouck Heights location; (2) his rate of pay would not change as a result of the transfer; and (3) he would be permitted to leave work by sundown on Fridays and would not be required to report to work prior to sundown on Saturdays.

44.     Shortly after execution, Pep Boys breached the Contract and/or harassed Dinnerman.

45.     First, after his transfer, Pep Boys retaliated against Dinnerman by decreasing his pay rate to $18 an hour, $2 less than his usual pay rate of $20 an hour.

46.     It was not until Dinnerman complained through counsel that Pep Boys restored his pay to $20 an hour.

47.     Pep Boys waited several weeks to make Dinnerman whole in backpay for the period during which it reduced his wage.

48.     Second, Pep Boys started to requires that Dinnerman report to the store *after* sundown on Saturdays.

49.     Specifically, Lemmo demanded that Dinnerman report to the store within 30 minutes of sundown every Saturday.

50.     Pep Boys' hours were from 7:00 a.m. to 9:00 p.m. on Saturdays.

51.     Dinnerman told Negron that the schedule was not feasible due to religious activities at the synagogue, which did not end until 8:00 p.m., and, regardless, it would be difficult, if not impossible, to leave the synagogue, change clothing, and report to Pep Boys.

52.     Dinnerman told Negron that their request for him to arrive at work just 30 minutes after sundown was impossible.

53.     Pep Boys' requirement was absurd.  Sundown changes each night and can be earlier than 4:30 p.m. near the winter solstice and later than 8:30 p.m. near the summer solstice.

54.     Despite the fact that Dinnerman made clear that Pep Boys' requirement would not accommodate his religious beliefs and practices, on January 13, 2020, Negron and Wolski reiterated to Dinnerman that he must report to work on Saturdays 30 minutes after sundown.

55.     On January 27, 2020, Dinnerman received a disciplinary action form for being at the synagogue instead of at work on Saturday after sundown.

56.     Lemmo stated that Dinnerman had violated Pep Boys' attendance policy.

57.     Pep Boys also threatened to take disciplinary action against Dinnerman that would result in his termination if he again did not appear at work within 30 minutes of sundown.

58.     Dinnerman explained to Pep Boys that the schedule did not accommodate his religious beliefs.

59.     Dinnerman also again explained that it would be impossible to arrive to work exactly 30 minutes after sundown.

60.     Pep Boys reiterated that Dinnerman had to return on Saturdays within 30 minutes of sundown, regardless of how many hours were left in the workday.

61.     Pep Boys' goal was clear: they intended to force Dinnerman to forgo his religious beliefs and practices and to harass him for requesting a religious accommodation so that he would resign.

62.     Unsurprisingly, in early February 2020, Dinnerman resigned, i.e., Pep Boys constructively discharged him.

63.     In Dinnerman's resignation letter, he states that he was resigning because Pep Boys' refusal to accommodate his religious beliefs had the workplace so intolerable that quitting was his only option.

64.     Pep Boys never addressed the religious discrimination even after receiving Dinnerman's resignation letter.

65.     Upon information and belief, Dinnerman's resignation was Pep Boys' goal since he had asked Vemmo for a religious accommodation.

66.     Pep Boys had made the workplace so intolerable for Dinnerman that a reasonable person in the same position of Dinnerman would have felt compelled to resign and Dinnerman's decision to resign was reasonable.

67.     In further retaliation, Defendant refused to pay Dinnerman his final bonus check for the month of December 2019 for his time working at the Pinebrook location.  Dinnerman should have received a bonus in correlation with the Pinebrook location's December 2019 budget, as he had received each month for all of 2019.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Religious-Based Discrimination (Terms and Conditions of Employment)**
**in Violation of Title VII**

68.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 67 with the same force as though separately alleged herein.

69.     Title VII prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's religion.

70.     The term "religion" includes all aspects of religious observance and practice, as well as belief.

71.     After an employee notifies the employer of his need for a religious accommodation, the employer has an obligation to reasonably accommodate the individual's religious practices.

72.     Plaintiff's religious observance, practice, and belief require him to not to work on Saturdays, the Shabbat.

73.     Defendant refused to accommodate Plaintiff's need to not work on Saturdays at all for many months.  Then, when it did allow him to not work on Saturday during the day, it required him to immediately report back to work, regardless of how many working hours were actually left in the day, and regardless of what religious activities he was immersed in, for no legitimate business purpose.

74.     That is, at no point did Defendant actually do what Title VII obligates it to do: provide Dinnerman with an accommodation that allows him to observe and practice his religious beliefs.

75.     Defendant made the workplace so intolerable that Dinnerman was forced to resign rather than continue to endure it.

76.     Defendant made the workplace so intolerable that a reasonable person in the same position as Plaintiff would have felt compelled to resign and the decision to resign was reasonable. Pep Boys constructively terminated Plaintiff's employment.

77.     As such, Defendant discriminated against Plaintiff with respect to his compensation, terms, conditions, and privileges of employment because of his religion.

78.     As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

79.     Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

## SECOND CAUSE OF ACTION
### Religious-Based Discrimination (Failure to Accommodate) in Violation of Title VII

80.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 79 with the same force as though separately alleged herein.

81.     Title VII prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's religion.

82.     The term "religion" includes all aspects of religious observance and practice, as well as belief.

83.     After an employee notifies the employer of his need for a religious accommodation, the employer has an obligation to reasonably accommodate the individual's religious practices.

84.     Plaintiff's religious observance, practice, and belief require him to not to work on Saturdays, the Shabbat.

85.     Defendant refused to accommodate Plaintiff's need to not work on Saturdays at all for many months.  Then, when it did allow him to not work on Saturday during the day, it required him to immediately report back to work, regardless of how many working hours were actually left in the day, and regardless of what religious activities he was immersed in, for no legitimate business purpose.

86.     That is, at no point did Defendant actually do what Title VII obligates it to do: provide Dinnerman with an accommodation that allows him to observe and practice his religious beliefs.

87.     Ultimately, Defendant made the workplace so intolerable that a reasonable person in the same position as Plaintiff would have felt compelled to resign and the decision to resign was reasonable.  Defendant constructively terminated Plaintiff's employment.

88.     As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

89.     Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

### THIRD CAUSE OF ACTION
### Religious-Based Discrimination (Hostile Work Environment) in Violation of Title VII

90.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 89 with the same force as though separately alleged herein.

91.     Title VII prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's religion.

92.     The term "religion" includes all aspects of religious observance and practice, as well as belief.

93.     After an employee notifies the employer of his need for a religious accommodation, the employer has an obligation to reasonably accommodate the individual's religious practices.

94.     Plaintiff's religious observance, practice, and belief require him to not to work on Saturdays, the Shabbat.

95.     Defendant refused to accommodate Plaintiff's need to not work on Saturdays at all for many months.  Then, when it did allow him to not work on Saturday during the day, it required him to immediately report back to work, regardless of how many working hours were actually left in the day, and regardless of what religious activities he was immersed in, for no legitimate business purpose.

96.     That is, at no point did Defendant actually do what Title VII obligates it to do: provide Dinnerman with an accommodation that allows him to observe and practice his religious beliefs.

97.     Instead, Defendant harassed Plaintiff by forcing him to show up to the work place for no reason, reducing his pay, issuing him a write up, and refusing to pay his December 2019 bonus, among other things.

98.     As such, Defendant subjected Plaintiff to a hostile work environment based on his religious beliefs and in retaliation for protected activity.

99.     As a direct and proximate consequence of Defendant's discriminatory and retaliatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress and damage to his professional reputation, all in amounts to be determined at trial.

100.    Defendant's discriminatory and retaliatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

### FOURTH CAUSE OF ACTION
### Religious-Based Discrimination (Unlawful Discharge) in Violation of Title VII

101.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 100 with the same force as though separately alleged herein.

102.    Title VII prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's religion.

103.    The term "religion" includes all aspects of religious observance and practice, as well as belief.

104.    After an employee notifies the employer of his need for a religious accommodation, the employer has an obligation to reasonably accommodate the individual's religious practices.

105.    Plaintiff's religious observance, practice, and belief require him to not to work on Saturdays, the Shabbat.

106.    Defendant refused to accommodate Plaintiff's need to not work on Saturdays at all for many months.  Then, when it did allow him to not work on Saturday during the day, it required him to immediately report back to work, regardless of how many working hours were actually left

in the day, and regardless of what religious activities he was immersed in, for no legitimate business purpose.

107.   That is, at no point did Defendant actually do what Title VII obligates it to do: provide Dinnerman with an accommodation that allows him to observe and practice his religious beliefs.

108.   Ultimately, Pep Boys made the workplace so intolerable that so intolerable that a reasonable person in the same position as Plaintiff would have felt compelled to resign and the decision to resign was reasonable.

109.   As such, Pep Boys constructively terminated Plaintiff's employment.

110.   As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

111.   Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

## FIFTH CAUSE OF ACTION
## Retaliation in Violation of Title VII

112.   Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 111 with the same force as though separately alleged herein.

113.   Title VII prohibits an employer from discriminating against any of his employees for opposing any practice made an unlawful employment practice under Title VII.

114.   Plaintiff opposed Defendant's unlawful religious discrimination and/or refusal to grant him a religious accommodation.

115.    Defendant retaliated against Plaintiff by reducing his compensation, forcing him to work on Saturdays, giving him a write up, not paying his December 2019 bonus, and constructively terminating his employment.

116.    As a direct and proximate consequence of Defendant's retaliatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress and damage to his professional reputation, all in amounts to be determined at trial.

117.    Defendant's retaliatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

**SIXTH CAUSE OF ACTION**
**Religious-Based Discrimination (Terms and Conditions of Employment) in Violation of NJLAD**

118.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 117 with the same force as though separately alleged herein.

119.    NJLAD prohibits an employer "… to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require a person to violate or forego a sincerely held religious practice or religious observance, including but not limited to the observance of any particular day or days or any portion thereof as a Sabbath or other holy day in accordance with the requirements of the religion or religious belief …."

120.    NJLAD also prohibits an employer from requiring an employee "… to remain at his place of employment during any day or days or portion thereof that, as a requirement of his

religion, he observes as his Sabbath or other holy day, including a reasonable time prior and subsequent thereto for travel between his place of employment and his home ….”

121.    Defendant violated the NJLAD by refusing to accommodate Plaintiff's sincerely held religious beliefs, to wit, failing to allow him to observe the Shabbat and various Shabbat-related activities, reducing his salary, giving him a write up, not paying his December 2019 bonus, and constructively terminating his employment.

122.    As such, Defendant violated the NJLAD.

123.    As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

124.    Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

## SEVENTH CAUSE OF ACTION
### Religious-Based Discrimination (Failure to Accommodate) in Violation of NJLAD

125.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 124 with the same force as though separately alleged herein.

126.    The NJLAD requires employers to accommodate their employees' sincerely held religious beliefs.

127.    Defendant violated the NJLAD by refusing to accommodate Plaintiff's sincerely held religious beliefs, to wit, failing to allow him to observe the Shabbat and various Shabbat-related activities.

128.    It would have been completely reasonable for Defendant to accommodate Plaintiff religious observance of the Saturday Sabbath, and no undue hardship would have affected the conduct of Defendant's business if a reasonable accommodation had been made.

129.    Notwithstanding, Defendant made no reasonable accommodation, and instead imposed as a condition of retaining employment, including opportunities for promotion, a requirement that Plaintiff violate and forego his Saturday Shabbat observance.

130.    Defendant did not even make a *bona fide* effort to accommodate Plaintiff sincerely held religious beliefs respecting the observance of a Saturday Shabbat.

131.    As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress and damage to his professional reputation, all in amounts to be determined at trial.

132.    Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

### EIGHTH CAUSE OF ACTION
### Religious-Based Discrimination (Hostile Work Environment) in Violation of NJLAD

133.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 132 with the same force as though separately alleged herein.

134.    The NJLAD requires employers to accommodate their employees' sincerely held religious beliefs.

135.    Defendant harassed Plaintiff by requiring him to work on Saturday, refusing to grant him a reasonable accommodation, forcing him to show up to the work place for no reason, reducing his pay, issuing him a write up, and refusing to pay his December 2019 bonus.

136.    As such, Defendant subjected Plaintiff to a hostile work environment based on his religious beliefs and in retaliation for protected activity.

137.    As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress, all in amounts to be determined at trial.

138.    Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

**NINETH CAUSE OF ACTION**
**Religious-Based Discrimination (Wrongful Discharge) in Violation of NJLAD**

139.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 138 with the same force as though separately alleged herein.

140.    The NJLAD requires employers to accommodate their employees' sincerely held religious beliefs.

141.    Defendant violated the NJLAD by refusing to accommodate Plaintiff's sincerely held religious beliefs, to wit, failing to allow him to observe the Shabbat and various Shabbat-related activities.

142.    Defendant made the workplace so intolerable that a reasonable person would be forced to resign rather than continue to endure it.

143.    As such, Plaintiff was constructively discharged.

144.    As a direct and proximate consequence of Defendant's discriminatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

145.    Defendant's discriminatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

### TENTH CAUSE OF ACTION
### Retaliation in Violation of NJLAD

146.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 145 with the same force as though separately alleged herein.

147.    NJLAD prohibit any person from taking reprisals against any person because that person has opposed any practices or acts forbidden under NJLAD or because that person has sought legal advice regarding rights under NJLAD, or shared relevant information with legal counsel.

148.    Plaintiff opposed Defendant's unlawful religious discrimination and/or refusal to grant him a religious accommodation.

149.    Defendant retaliated against Plaintiff by refusing to provide him with a religious accommodation, reducing his compensation, giving him a write up, not paying his December 2019 bonus, and constructively terminating his employment.

150.    As a direct and proximate consequence of Defendant's retaliatory treatment, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

151.    Defendant's retaliatory treatment of Plaintiff was willful, malicious, and/or in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff seeks an award of punitive damages against Defendant.

## ELEVENTH CAUSE OF ACTION
### Breach of Contract

152.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 151 with the same force as though separately alleged herein.

153.    On December 20, 2019, Plaintiff entered into the Contract with Defendant.

154.    One term or condition of the Contract was that Plaintiff would be permitted to take leave to make personal religious observances every Saturday without exception.

155.    There is *no* mention in the Contract of Plaintiff having to appear at the workplace within 30 minutes of sunset each Saturday.

156.    In accepting this term or condition, the parties intended to protect Plaintiff's personal interest in adherence to his sincerely held religious practices and observances.

157.    Defendant breached the contract by forcing Plaintiff to come to work on Saturday, generally breaching or abrogating the term or condition that he never work on Saturdays, and by constructively terminating his employment.

158.    As a direct and proximate consequence of Defendant's breach, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress, all in amounts to be determined at trial.

## TWELFTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealings

159.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 158 with the same force as though separately alleged herein.

160.    On or about December 20, 2019, Plaintiff entered into the Contract with Defendant.

161.    All contracts in New Jersey impose an implied covenant of good faith and fair dealings.

162.    Among the requirements of the implied covenant of good faith and fair dealing entered into by the Defendant were that the Plaintiff would be fairly and reasonably accommodated in the exercise of his sincerely held religious practices.

163.    Defendant forced Plaintiff to return to the workplace within 30 minutes of sundown.

164.    Defendant's conduct constitutes a breach of the implied covenant of good faith and fair dealing, to the detriment of Plaintiff.

165.    As a direct and proximate consequence of Defendant's breach, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, lost wages, benefits, and other income, and emotional distress and damages to his professional reputation, all in amounts to be determined at trial.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

B. For the second cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

C. For the third cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

D. For the fourth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

E. For the fifth cause of action, compensatory damages, punitive damages, and attorney's fees and costs;

F.  For the sixth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

G.  For the seventh cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

H.  For the eighth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

I.  For the nineth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

J.  For the tenth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

K.  For the eleventh cause of action, compensatory damages, punitive damages, attorneys' fees, and costs;

L.  For the twelfth cause of action, compensatory damages, punitive damages, attorneys' fees, and costs; and

M.  For such other and further relief as the Court deems just and proper.

Dated: New York, New York
         May 11, 2021

                                    THE LIDDLE LAW FIRM PLLC


                        By:    s/ Edgar M. Rivera                        
                               Edgar M. Rivera
                               1177 Avenue of the America, 5th Fl.
                               New York, NY 10036
                               Office: 646-452-7212
                               Mobile: 646-400-2249
                               erivera@liddlelaw.com

                               *Attorneys for Plaintiff*

22